Donald S. Zakarin (DZ 6355)
Lisa M. Buckley (LB 5541)
Frank P. Scibilia (FS 3984)
PRYOR CASHMAN LLP
7 Times Square
New York, New York  10036
(212) 421-4100
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CIV 4695

| | |
|---|---|
| EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., SCREEN GEMS-EMI MUSIC INC., JOBETE MUSIC CO. INC., SONY/ATV TUNES, LLC, SONY/ATV SONGS LLC, SONY/ATV TREE PUBLISHING, SONY/ATV CROSS KEYS PUBLISHING, SONY/ATV MELODY, SONY/ATV ACUFF ROSE MUSIC, UNIVERSAL MUSIC PUBLISHING GROUP, INC., UNIVERSAL-POLYGRAM INTERNATIONAL PUBLISHING, INC., UNIVERSAL MUSIC-Z TUNES LLC, UNIVERSAL MUSIC-Z SONGS, UNIVERSAL SONGS OF POLYGRAM INTERNATIONAL, INC., SONGS OF UNIVERSAL, INC., UNIVERSAL MUSIC MGB SONGS, ALAMO MUSIC CORP., WB MUSIC CORP., WARNER-TAMERLANE PUBLISHING CORP., DEVON MUSIC, INC., HAMPSHIRE HOUSE PUBLISHING CORP., ESSEX MUSIC, INC., ESSEX MUSIC INTERNATIONAL, INC., EVIL EYE MUSIC, INC., FRANK MUSIC CORPORATION, PEER INTERNATIONAL CORPORATION, SONGS OF PEER, LTD., PEERMUSIC III, LTD., BUG MUSIC, INC. and HITCO MUSIC PUBLISHING, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> LIME WIRE LLC, LIME GROUP LLC, MARK GORTON, GREG BILDSON, and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP, <br><br> Defendants. | Civil Action No.: <br><br> **COMPLAINT** |

1024495

Plaintiffs hereby allege on personal knowledge as to allegations concerning themselves, and on information and belief as to all other allegations, as and for their Complaint against Defendants Lime Wire LLC, Lime Wire Group LLC ("Lime Group"), Mark Gorton ("Gorton") (collectively "Lime Wire"), Greg Bildson ("Bildson") and M.J.G. Lime Wire Family Limited Partnership ("Lime Wire FLP") (collectively "Defendants"), as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are music publishers that own or control some of the best-known musical works in the world, including such valuable works as "Billie Jean," "A Boy Named Sue," "Georgia On My Mind," "It's The Same Old Song," "My Generation," "Unchained Melody," "Umbrella," "Say My Name," and "We Are Family." Defendants, who are conducting business under the trade name "Lime Wire," are Internet pirates unlawfully copying and distributing Plaintiffs' copyrighted musical works on a massive scale, and profiting greatly from their illegal activities. Plaintiffs bring this action to redress Defendants' brazen infringement of Plaintiffs' copyrights.

2.      This Court already has found in a related action, Arista Records LLC v. Lime Group LLC, et al., Civil Index No. 06 CV 5936 (KMW) ("Arista case"), brought by several major record labels, that by distributing and maintaining the Lime Wire peer-to-peer ("P2P") file sharing software and system, Lime Wire intentionally encouraged direct infringement of sound recordings by its users. In a lengthy, detailed decision (the "Arista Decision") issued on May 11, 2010, this Court found that Lime Wire is liable to the record company plaintiffs for the inducement of infringement of their copyrighted sound recordings. As Plaintiffs in this case own musical compositions embodied in sound recordings copied and distributed via the Lime Wire software and network – including most of those very same sound recordings at issue in the Arista

2

case – Defendants necessarily are liable to Plaintiffs for, among other things, inducement of copyright infringement.

3.     As the Court found in the <u>Arista</u> Decision, Lime Wire has been, at all relevant times, aware of the substantial infringement being committed by Lime Wire users.  The Court specifically referenced internal communications in which Lime Wire employees freely discussed the fact that Lime Wire users downloaded copyrighted digital recordings through the program and openly referred to a substantial percentage of users as "hardcore pirates."  Lime Wire employees even maintained a collection of articles in a file candidly and descriptively labeled "Knowledge of Infringement."

4.     Not only is Lime Wire aware of the rampant copyright infringement being committed by its users, but as the Court also found in the <u>Arista</u> Decision, the company actively seeks to attract infringing users to the Lime Wire system.  For example, after a federal court found Napster liable for facilitating copyright infringement committed by Napster users and the site shut down, Lime Wire contemplated various marketing campaigns aimed at promoting Lime Wire to Napster users.  For several years thereafter, Lime Wire conducted a marketing campaign through Google AdWords whereby Google users who entered queries including words like "Napster" and "mp3 free downloads" would see an advertisement for Lime Wire.

5.     In the <u>Arista</u> Decision, the Court further found that Lime Wire's search functions are designed to facilitate searches for copyrighted digital recordings.  The program's user interface allows users to search for specific artists or albums or to search for music by genre.  A number of Lime Wire's genre categories, such as "Classic Rock," and "Top 40," relate specifically to popular music and inevitably guide users to copyrighted works.  In addition to ensuring that users can obtain unauthorized copies of recordings through Lime Wire, evidence uncovered in the <u>Arista</u> case revealed that Lime Wire actively assists users in committing

infringement by offering technical information to users who requested assistance in sharing and
downloading digital music files, most of which were copyrighted.

6.      Lime Wire easily could have, but failed to mitigate known infringing activities.
As this Court found in the Arista Decision, Lime Wire has not meaningfully implemented any of
the technological barriers or design choices that are available to decrease infringement through
file-sharing programs, such as hash-based filtering, acoustic fingerprinting or filtering based on
other digital metadata.

7.      The Court further concluded in the Arista Decision that Lime Wire depends on
infringement for the success of its business.  More specifically, the Court found from 2004 to
2006, Lime Wire's annual revenue grew from nearly $6 million to an estimated $20 million.
Lime Wire has estimated that its software was downloaded over three million times during its
first year in existence and has proudly proclaimed that approximately two million users accessed
the program every month.  Defendants continued to develop Lime Wire's user base by
promoting the program's infringing capabilities and marketing it to users known to commit
infringement.  At the same time, Lime Wire earned revenue primarily by selling advertising
space on Lime Wire and Lime Wire's website, and by distributing software bundled with Lime
Wire. As Lime Wire's user base expanded, Defendants' revenues from advertising and software
distribution increased.  In 2004, Lime Wire began selling Lime Wire "Pro," an upgraded version
of Lime Wire that is available for purchase and makes file-sharing activities easier.  Then, in
2008, Lime Wire obtained licenses to sell approximately half a million songs to Lime Wire users.
Thus, Defendants' commercial success is derived largely from the high-volume use of the Lime
Wire software and network, most of which is infringing.

8.      In sum, the scope of Defendants' knowing and deliberate infringement is massive,
as is the harm that Defendants have caused to Plaintiffs, who earn revenues from the sale of

4

records embodying their compositions, as well as through licensing their works to online music services.  Millions of infringing copies of sound recordings embodying Plaintiffs' compositions have been made and distributed through Lime Wire and continue to be made and distributed through Lime Wire to this day.  These infringing copies have been permanently stored, played, and further distributed by Lime Wire's users.  Thus, Lime Wire substantially replaces the need to *buy* recordings from legitimate retailers and displaces authorized online sales and distribution services.

9.      This Court has already found in the <u>Arista</u> case that Lime Wire was designed, built and maintained to induce copyright infringement of sound recordings.  Plaintiffs own or control the exclusive rights in the compositions embodied in the sound recordings that Lime Wire has infringed and that Lime Wire continues to infringe on a massive scale every single day.  Defendants should be required to compensate Plaintiffs for the incalculable damage they have caused by virtue of their calculated, profligate copyright infringement.

## JURISDICTION AND VENUE

10.      This is a civil action seeking injunctive relief and damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

11.      The Court has original subject matter jurisdiction over the Copyright Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and the state law and common law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

12.      The Court has personal jurisdiction over the Defendants because each resides and/or may be found in New York, does systematic and continuous business in New York, and has performed acts directed at and causing harm in New York which give rise to this Complaint.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and 28 U.S.C. § 1400(a).

1024495

## THE PLAINTIFFS AND THEIR BUSINESS

14.     Plaintiffs, well-known and respected music publishing companies, are the copyright owners or owners of exclusive rights in a vast quantity of copyrighted compositions exploited in the United States and throughout the world.  Under the Copyright Act, Plaintiffs have, *inter alia*, the exclusive rights to reproduce and distribute the copyrighted musical works, including by means of digital transmission, and to authorize others to engage in any such activities. 17 U.S.C. §§ 106.

15.     As music publishers, Plaintiffs are in the business of licensing to others the exclusive rights to reproduce and distribute copyrighted musical works in the form of CDs, cassettes, vinyl records and digital downloads, among other uses, in exchange for the payment of royalties.  That is how Plaintiffs make their money, stay in business and collectively employ many thousands of people.  Plaintiffs share the royalties they are paid from the lawful exploitation of the copyrighted works they own with the writers of the songs, who rely on this income for their livelihoods.

16.     Plaintiffs EMI April Music Inc., EMI Blackwood Music Inc., Screen Gems-EMI Music Inc. and Jobete Music Co. Inc. (collectively, "EMI"), with their principal places of business in New York, are engaged in the business of music publishing whereby they license the recording, reproduction and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

17.     Plaintiffs SONY/ATV Tunes, LLC, SONY/ATV Songs LLC, SONY/ATV Tree Publishing, SONY/ATV Cross Keys Publishing, SONY/ATV Melody and SONY/ATV Acuff Rose Music (collectively, "SONY/ATV"), with their principal places of business in New York, are engaged in the business of music publishing whereby they license the recording, reproduction

1024495

and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

18.     Plaintiffs Universal Music Publishing Group, Inc., Universal-Polygram International Publishing, Inc., Universal Music-Z Tunes LLC, Universal Music-Z Songs, Universal Songs of Polygram Int., Inc., Songs of Universal, Inc., Universal Music MGB Songs and Alamo Music Corp. (collectively, "Universal") with their principal places of business in California, are engaged in the business of music publishing whereby they license the recording, reproduction and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

19.     Plaintiffs WB Music Corp. and Warner-Tamerlane Publishing Corp. (collectively, "Warner/Chappell"), with their principal places of business in New York, are engaged in the business of music publishing whereby they license the recording, reproduction and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

20.     Devon Music, Inc., Hampshire House Publishing Corp., Essex Music, Inc., Essex Music International, Inc. and Evil Eye Music, Inc. (collectively, "TRO"), with their principal places of business in New York, are engaged in the business of music publishing whereby they license the recording, reproduction and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

21.     Plaintiff Frank Music Corp. ("Frank Music"), with its principal place of business in New York, is engaged in the business of music publishing whereby it licenses the recording, reproduction and distribution of musical works it owns or controls the copyrights and the exclusive rights related to such works, in whole or in part.

7

22.     Plaintiffs Peer International Corporation, Songs of Peer, Ltd. and Peermusic III, Ltd. (collectively, "Peer"), with their principal places of business in New York, are engaged in the business of music publishing whereby they license the recording, reproduction and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

23.     Plaintiffs Bug Music, Inc. and Hitco Music Publishing, LLC (collectively, "Bug Music") with their principal places of business in California, are engaged in the business of music publishing whereby they license the recording, reproduction and distribution of musical works for which they own or control the copyrights and the exclusive rights related to such works, in whole or in part.

24.     Attached as Exhibit A is a non-exhaustive, exemplary list of 80 of Plaintiffs' musical compositions that have been copied and publicly distributed, performed without Plaintiffs' authorization, through the conduct described in this Complaint.  The copyright in each of these musical compositions is registered in the United States Copyright Office. 17 U.S.C. §§ 409-412.

25.     Although still a haven for piracy the Internet now features a substantial number of legitimate avenues for the sale and digital distribution of music, including Apple's iTunes, Rhapsody, AOL Music, Yahoo! Music, Napster and others.  Unlike Defendants' Lime Wire technology, these services operate lawfully and pay Plaintiffs for the use and distribution of their copyrighted works.  Other legal services to lawfully distribute copyrighted musical works via the Internet are emerging all the time.

## THE DEFENDANTS

26.     Defendants design, build, promote, distribute, sell, maintain and support software and related services under the "Lime Wire" name and variations thereof.

8

27.     Defendant Lime Group is a Delaware limited liability corporation with its principal place of business in New York, New York.

28.     Defendant Lime Wire LLC is a Delaware limited liability corporation with its principal place of business in New York, New York, and is a wholly-owned subsidiary of defendant Lime Group, with which it shares offices and officers/employees.  Lime Wire LLC and Lime Group jointly and severally, and directly and indirectly, designed Lime Wire and update, improve, promote, distribute and market Lime Wire.

29.     Defendant Lime Wire FLP is a Nevada limited partnership, which operates under the control of its general partner Mark Gorton.  As reflected in the Arista Decision, Gorton established Lime Wire FLP in early 2005.  In June 2005, Lime Wire FLP purchased Lime Group's share of Lime Wire LLP.  Defendant Lime Wire FLP was formed to further Defendants' unlawful actions and to protect the monetary gains derived from those actions.

30.     At all times relevant to this action, defendant Lime Group has had exclusive and complete domination and control over defendant Lime Wire LLC, such that Lime Wire LLC is its alter ego and mere instrumentality. There is a substantial and continuing connection between Lime Group and Lime Wire LLC with respect to the actions complained of herein.

31.     Defendant Mark Gorton is a principal and the Chief Executive Officer of defendant Lime Wire LLC as well as its sole director.  He is also a member and the Chief Executive Officer of defendant Lime Group.  Gorton owns 100% of Lime Group.  He is a general partner in Lime Wire FLP.  Mr. Gorton is, and at all relevant times was, the dominant influence in Lime Group and Lime Wire FLP, and, along with Defendant Greg Bildson, in Lime Wire LLC.  Gorton has been personally and substantially involved in and has profited greatly from the design, promotion, marketing and distribution of Lime Wire.

9

32.     From the summer or fall of 2000 until his departure from the Company in or around the summer of 2008, defendant Greg Bildson was the Chief Technology Officer and Chief Operating Officer of defendant Lime Wire LLC.  Along with Defendant Mark Gorton, Bildson was the dominant influence in defendant Lime Wire LLC and has been personally and substantially involved in and has profited greatly from the design, promotion, marketing and distribution of Lime Wire.

33.     Defendant Mark Gorton, in both his corporate and personal capacities, participated in and caused Lime Wire LLC and Lime Group to participate in the acts complained of herein.  Gorton, for example, (i) participated in the design, promotion, marketing and distribution of Lime Wire and had the right and ability to supervise others taking those actions, (ii) possesses policy-making authority and control over Lime Wire LLC and direct supervisory responsibility over Lime Wire LLC's employees, (iii) was aware of, personally oversaw or directed, and approved of the actions complained of herein, and (iv) made public statements that encouraged, facilitated and induced copyright infringement of sound recordings embodying Plaintiffs' copyrighted musical compositions through Lime Wire.

34.     Defendant Greg Bildson, in both his corporate and personal capacities, participated in and caused Lime Wire LLC and Lime Group to participate in the acts complained of herein.  Bildson, for example, (i) participated in the design, promotion, marketing and distribution of Lime Wire and had the right and ability to supervise others taking those actions, (ii) possessed policy-making authority and control over Lime Wire LLC and direct supervisory responsibility over Lime Wire LLC's employees, (iii) was aware of, personally oversaw or directed, and approved of the actions complained of herein, and (iv) made public statements that encouraged, facilitated and induced copyright infringement of sound recordings embodying Plaintiffs' copyrighted musical compositions through Lime Wire.

35.    The design, promotion, marketing and distribution of Lime Wire are the result of decisions and actions that have been made jointly among the Defendants.

36.    Each of the Defendants is/or at all relevant times was a party to the unlawful actions complained of, and acted in concert or combination with each of the other Defendants and/or has acted as an agent for each of the other Defendants with respect to the actions and matters described in this Complaint.

37.    In the Arista Decision, the Court determined that Lime Group and Gorton were vicariously liable for Lime Wire's inducement of copyright infringement.  Specifically the Court found that Gorton directed and benefited from many of the activities that gave rise to Lime Wire's liability.  Gorton "ran" Lime Wire; he was the company's "ultimate decision maker" and his approval was required for "any major strategic and design decisions." (Arista Decision at p. 53).  Gorton directed and approved many aspects of Lime Wire's design and development.  He decided that the program should be decentralized and should use P2P technology.  Gorton made decisions regarding Lime Wire's public relations and advertising efforts, and was involved in discussions about marketing Lime Wire to Napster users.  The Court concluded that this evidence established that Gorton knew about the infringement being committed through Lime Wire.

38.    The Court further determined in the Arista Decision that Lime Group was intimately involved in Lime Wire's operations.  Gorton was Chief Executive Officer of both Lime Wire LLC and Lime Group.  And while Lime Wire LLC and Lime Group formally are separate entities, the Court found that Gorton operated them as a single company.  Lime Group and Lime Wire LLC share offices, computer services and support staff.  Employees moved between the two companies without changing titles or job responsibilities.  Lime Group employees developed much of Lime Wire's original technology and then provided systems

administration support for Lime Wire.  Lime Group provides numerous services to Lime Wire

LLC, including managing its financial operations, hiring and employee benefits. (Arista Decision

pp. 54-55).  In sum, the Court found that as the majority owner of Lime Wire LLC until 2005,

Lime Group directly benefited from Lime Wire LLC's inducement of infringement through Lime

Wire, which drove the Company's success, and because Gorton owned 100% of Lime Group, he

benefited from Lime Wire's infringing conduct.  As a result, the Arista Court held that Lime

Group and Gorton are vicariously liable for Lime Wire's inducement of copyright infringement.


## FACTS

**How Lime Wire Works**

39.     Lime Wire LLC was founded in June 2000.  The company released the Lime

Wire software and network system in August of 2000.

40.     Lime Wire is a file-sharing program that utilizes P2P technology.  By employing

P2P technology, Lime Wire permits its users to share digital files via an internet-based network

known as the "Gnutella network."  At all times relevant hereto, Lime Wire users have been able

to share almost all files stored on their computers with other Lime Wire users.  Indeed, Lime

Wire recommended that "all Lime Wire users share generously with one another."  At all times

relevant hereto, Lime Wire's default settings made all files that a user downloads through Lime

Wire available to other Lime Wire users for download.

41.     Defendants have designed, updated (via release of new versions), promoted,

marketed, distributed and maintained two types of Lime Wire software.  A free version of Lime

Wire software, called "Lime Wire Basic," is available for on-line download from Lime Wire's

web site.  An enhanced version, called "Lime Wire PRO," promising "turbo charged

downloads," currently is sold by Lime Wire for approximately $22.  The two types of Lime Wire

are fully compatible with one another. Lime Wire PRO users are able to search for and download files from each other and from Lime Wire Basic users, and vice versa.

42.     Use of the Lime Wire software begins with the installation process. Both the basic and "enhanced" versions of Lime Wire can be installed by way of a download from Lime Wire's web site. Defendants designed Lime Wire so that when a user installs the software on his or her computer, Lime Wire automatically searches the computer for media files (*i.e.*, sound recording files) to be "shared" (or made available to other Lime Wire users for downloading). This feature allows each Lime Wire user to quickly and easily make his or her entire collection of sound recordings available to other Lime Wire users around the world. Thus, one user's files are available to millions of other Lime Wire users.

43.     Lime Wire "shares," or makes available for download, files that have been copied to a designated portion of the user's hard drive. Defendants have taken steps to ensure that Lime Wire users "share" a large number of files on Lime Wire, thereby maintaining the draw and reputation of Lime Wire as a vast, unauthorized repository of commercial sound recordings embodying Plaintiffs' copyrighted compositions. For example, Defendants designed Lime Wire to penalize those users – called "freeloaders" by Lime Wire – who did not "share" enough files with other Lime Wire users. Freeloaders could be blocked from downloading files from a Lime Wire user if that user so desired. Defendants highlighted and touted the "freeloader" blocking feature on the Lime Wire website, stating, for example, "If you're not sharing enough files, users with certain connection preferences won't let you connect to them for downloading. For this reason, *we recommend all Lime Wire users share generously with one another*" (emphasis added). As the Court in the Arista case found, the vast majority of the files "shared" or copied through Lime Wire are copyrighted sound recordings. Because Plaintiffs' copyrighted

13

compositions are embodied in these sound recordings, the Defendants' call for Lime Wire users

to "share" files is a call for Lime Wire users to infringe Plaintiffs' copyrighted works.

44.     Lime Wire facilitates the search for and download of sound recordings in various

ways.  Users can search by genre of music, including the genres of "Top 40" and "Classic Rock,"

which, as the <u>Arista</u> Court determined are comprised largely of copyrighted sound recordings.

These same sound recordings embody copyrighted compositions owned by the Plaintiffs.

45.     Other features show that Lime Wire was designed for the downloading of sound

recordings and the underlying musical compositions embodied therein that are owned or

controlled by Plaintiffs.  Lime Wire includes a built-in audio player (but not text editor, picture

viewer, or other tools for using non-audio files).  The player not only enables users to listen

immediately to sound recordings that have been downloaded, but also has a preview function

that will play part of a sound recording before the whole file is downloaded.  This feature permits

users to verify the "authenticity" or quality of sound recordings found on Lime Wire (based on a

title or artist search) prior to completing the download process, thereby preventing downloads of

partial or "bad" files, and facilitating the downloading of a greater number of infringing files.

46.     Lime Wire PRO in particular has been designed and promoted for its superior

infringement capabilities.  For example, Defendants have stated that "[t]he purchase of Lime

Wire PRO gives users better search results, turbo-charged download speeds, connections to more

sources, [and] a guarantee of no ads or nagware. . . ."

**Lime Wire Was Aware of Users' Infringing Activity**

47.     The very manner in which Lime Wire was designed and promoted demonstrates

that Defendants have both actual and constructive knowledge of the massive infringement of

Plaintiffs' copyrights occurring via Lime Wire.  Defendants' knowledge and intent are apparent

in other respects as well.  For example, Defendants made it easy for a user to download and

install Lime Wire even *after* indicating that he or she "intend[s] to use Lime Wire for copyright infringement." Following a perfunctory refusal by Defendants' web site, the user simply navigates back to the prior page, changes his or her answer, and is allowed to continue with the download.

48.     Indeed the Court specifically found in the <u>Arista</u> Decision that Lime Wire was aware of the substantial infringement being committed by Lime Wire users. In reaching its conclusion the Court relied on internal communications wherein Lime Wire regularly discussed the fact that Lime Wire users downloaded copyrighted digital recordings through the program. For example, a draft of a Lime Wire Offering Memorandum created in 2001, states that Lime Wire "allows people to exchange copyrighted mp3 files." (<u>Arista</u> Decision at pp.32-33). A September 2002 statement of Lime Wire's goals acknowledged that: "Currently, the most common use of the Gnutella Network is the sharing of music files, many of them copyrighted." (<u>Id.</u> at 33) Other internal Lime Wire documents stated that "the only information being shared on peer networks are media files," a category the Court found was composed primarily of copyrighted digital recordings, and that the "sharing of media files is bringing the initial user base" to Lime Wire. (<u>Id.</u>)

49.     The Court further found in the <u>Arista</u> Decision that in 2006, Lime Wire developed a strategic plan to "convert" Lime Wire users who were sharing unauthorized digital recordings into customers of Lime Wire's online music store, which would sell authorized music (the "Conversion Plan"). (<u>Arista</u> Decision at p.33). In the Conversion Plan, Lime Wire openly acknowledged that the majority of Lime Wire's users were infringers. The Plan stated that (1) 25% of Lime Wire's users were "hardcore pirates;" (2) 25% of users were "morally persuadable;" (3) 20% of users were "legally aware;" and (4) 30% of users were "samplers and convenience users." (<u>Id.</u>) The Conversion Plan provided that over time Lime Wire would

15

introduce features to Lime Wire to block users from downloading infringing recordings and to direct them to Lime Wire's online store. (Id.)

50.    In concluding that Lime Wire knew that its users were committing copyright infringement, the Court also relied on (1) emails sent to the company by Lime Wire users; (2) a collection of articles maintained by Lime Wire employees in a file labeled "Knowledge of Infringement;" and (3) the numerous mainstream news articles about widespread infringing activities through Lime Wire and similar peer to peer networking programs. (Arista Decision at pp. 33-34).

51.    In addition the Court found that to ensure users can obtain unauthorized copies of recordings through Lime Wire, Lime Wire has actively assisted users in committing infringement.  In many instances, Lime Wire users requested assistance in sharing and downloading digital music files, most of which were copyrighted.  In response, Lime Wire employees offered technical information about the system's functionality, thereby helping users obtain unauthorized copies of recordings.  (Arista Decision at pp. 36-37 ).

**Lime Wire Actively Promoted the Service to Attract Infringing Users**

52.    In the Arista Decision, the Court found that Lime Wire not only knew about substantial infringement by Lime Wire users, but that it actually made extensive efforts to attract infringing users, including users of other illegal services.  For example, in February 2001, a court ordered injunction shut down Napster after it was found liable on the ground that it had facilitated copyright infringement committed by Napster users.  Following Napster's demise, Lime Wire announced that it expected thirty percent, "with possibly up to 100 percent" of Napster users to switch to using Lime Wire and similar programs such as Kazaa and Morpheus. Lime Wire developed plans to attract Napster users to Lime Wire. (Arista Decision at p. 34). Internal email correspondence, often involving Lime Wire's CEO and Director Mark Gorton,

reveal that Lime Wire contemplated a number of strategies to promote Lime Wire to Napster users, including initiating press campaigns on college campuses relating to "file-sharing and getting free MP3's;" hiring "campus reps" at "Napster banned colleges;" running a "Napster Independence Day" promotion; and publicizing features of Lime Wire that make "finding your favorite artist or album...easier."(Id.)

53.    As reflected in the <u>Arista</u> Decision, from 2002 to 2006, Lime Wire conducted a marketing campaign through Google AdWords, whereby Google users who entered certain search queries, such as "replacement napster," "napster mp3," "napster download," "kazaa Morpheus," "mp3 free download," and dozens of other phrases containing the words "napster," "kazaa," or "Morpheus," would see an advertisement leading to the Lime Wire website. "Kazaa" and "Morpheus" were, like Napster and Lime Wire, illegal P2P services. (<u>Arista</u> Decision at pp. 34-35).  Similarly, Lime Wire's Google advertisements promoted Lime Wire with direct references to other infringement-fostering programs.  For example, Lime Wire purchased banner advertisements that read "Join Millions of Morpheus users and download the best P2P file-sharing application for free.  Free music downloads...;" "Outperforms Morpheus!;" and "Faster Downloads Than Kazaa!" (<u>Id.</u> at p. 35).  Lime Wire also marketed its network system as "similar to the popular Napster service...." (<u>Id.</u>)  Thus, there is no question that Lime Wire's vast user base was built based on marketing campaigns aimed at infringers and, as set forth in detail below, Lime Wire has profited greatly from building that user base.


**Lime Wire Has The Ability But Has Failed To Mitigate Infringing Activities**

54.    Defendants have the right and ability to supervise and control the infringing activities of Lime Wire users on Defendants' system/network.  For example, Defendants can view searches on Lime Wire and view what is being "shared" via Lime Wire at a given time.

17

Defendants provide the Lime Wire software to users, distribute updates and upgrades, and have dictated license terms governing the use of the software. Defendants maintain email addresses of Lime Wire PRO users, and provide those users with personalized technical support and free access to updated versions of Lime Wire PRO within the first six months of purchase of Lime Wire PRO.

55.    Defendants have directly and substantially profited from the free availability of tens of thousands of Plaintiffs' copyrighted works on Lime Wire. Thus, there is little or no incentive for Defendants to exclude those works from Lime Wire. Indeed, the availability of Plaintiffs' copyrighted works is *the* draw to the Lime Wire system, and the motivation for users to purchase Lime Wire software from Defendants. Defendants use the free version of Lime Wire to help populate the Lime Wire network with infringing material to, among other reasons, entice paying users of Lime Wire PRO. Defendants have derived substantial profits from purchases of its software.

56.    It is therefore not surprising that, as the Court specifically found in the Arista Decision, Lime Wire failed to implement in a meaningful way any of the technological barriers and design choices that are available to diminish infringement, including hash-based filtering, acoustic fingerprinting, or filtering based on other digital metadata.

57.    Lime Wire's ability to diminish infringement is further demonstrated by the fact that in May 2006, Lime Wire implemented an optional, hash-based content filter. A hash-based filter can identify a digital file that contains copyrighted content, and block a user from downloading the file. The "default" setting of Lime Wire's hash-based filter was "off," however, meaning that Lime Wire users would have to affirmatively turn the filter "on" for it to have any effect on the transfer of digital recordings to or from their computers. Lime Wire could have made the hash-based content filter mandatory for all Lime Wire users. Lime Wire's decision to

18

make "off" the default setting was a conscious "design choice," the direct result of which was a failure to mitigate infringement. (<u>Arista</u> Decision at pp. 38-39).

58.     Likewise, as reflected in the <u>Arista</u> Decision, Lime Wire considered, but failed to implement, several other plans to block the availability of infringing content through Lime Wire. Lime Wire discussed a plan for a "hybrid" filtering system that would have combined hash-based filtering and acoustic fingerprinting. The company also developed, but did not implement, its Conversion Plan, which would have included hash-based filtering and acoustic fingerprinting to prevent users from downloading unauthorized files, as well as a user education campaign designed to inform users about the legal consequences of copyright infringement and to promote the purchase of authorized music through the Lime Wire online store. (<u>Arista</u> Decision at pp. 39-40).

59.     Lime Wire was aware of other filtering mechanisms that it could have, but did not use to mitigate infringing activity by users. For example, the Court found in the <u>Arista</u> Decision that Lime Wire could have used a keyword-based filter to block unauthorized recordings from appearing in Lime Wire searches. The company uses keyword-based filtering to allow users to limit their receipt of pornographic content and also has implemented filters to prevent online sharing of personal document files and software program files. (<u>Arista</u> Decision at p. 40).

60.     Significantly, Lime Wire does employ active filtering technology, to prevent Lime Wire users from sharing digital recordings purchased from the Lime Wire online store. As the Court recognized, this selective filtering which, on information and belief, continues today, further demonstrates Lime Wire's knowledge of infringement-mitigating technologies and the company's intentional decision not to employ any such technologies in a way that meaningfully deters Lime Wire users' infringing activities. (<u>Arista</u> Decision at p. 38).

19

61.    The only step Lime Wire has taken to address infringement is to post an electronic notice that appears when a user first downloads Lime Wire. The notice stated that "Lime Wire Basic and Lime Wire PRO are peer-to-peer programs for sharing authorized files only. Downloading either program does not constitute a license for obtaining or distributing unauthorized content." Before a user could initiate the download of the Lime Wire software, he or she had to choose from the following statements: (1) "I will not use Lime Wire for copyright infringement," or (2) "I might use Lime Wire for copyright infringement." If the user selected the second option, Lime Wire would not download. The user could then change his or her response to "I will not use Lime Wire for copyright infringement" in order to download the program. As the Court found in the <u>Arista</u> Decision, the notice and "statement of intent" requirement, on their own, do not constitute meaningful efforts to mitigate infringement. (<u>Id.</u> at pp. 40-41).

62. .    Lime Wire chose not to implement any meaningful infringement-reduction strategies in part because it recognized that, "as long as there were other [P2P] applications that didn't filter," Lime Wire users would respond to filtering by switching "to another [P2P application] that doesn't have that filtering behavior or that is less aggressive in making fewer files available." (<u>Arista</u> Decision at p. 41).

**<u>Lime Wire Depends on Infringement For The Success of Its Business</u>**

63.    Since Defendants first made Lime Wire available in August 2000, hundreds of millions of copies of Lime Wire have been downloaded by users. Lime Wire's website, which boasts of the number of "hosts" from whom Lime Wire users can download files, indicates that, at any given moment, the electronic files of more than two million persons can be downloaded using Lime Wire. Millions of downloads occur through Lime Wire, the vast majority of which are unauthorized downloads of copyrighted material – including especially Plaintiffs'

copyrighted works.  A representative list of some of Plaintiffs' works available on Lime Wire is annexed hereto as Exhibit A.

64.     In addition, Defendants have profited from and continue to profit from Lime Wire Basic users through payments received from third-parties for:  (i) advertisements displayed on Lime Wire Basic, (ii) third-party software bundled with Lime Wire Basic, and (iii) a "shopping" function in Lime Wire Basic.  The amount of payments received in connection with the foregoing is directly related to the number of users or extent of use of Lime Wire Basic — use that consists almost exclusively of the infringement of Plaintiffs' copyrights.

65.     In the Arista Decision the Court specifically found that Lime Wire depends on infringement for the success of its business.  For example, from 2004 to 2006, Lime Wire's annual revenue grew from nearly $6 million to an estimated $20 million.  As the Court recognized, such growth has depended greatly on Lime Wire users' ability to commit infringement through Lime Wire.  (Arista Decision at p. 37).  Since 2001, Lime Wire has developed an enormous user base.  The program is widely available online and can be downloaded for free.  Lime Wire has estimated that Lime Wire was downloaded over three million times during its first year in existence.  By 2003, Lime Wire boasted that around two million users accessed the program every month.  Lime Wire has acknowledged that the "sharing of media files," a category comprised mostly of copyrighted digital recordings, "brought the initial user base" to Lime Wire. (Id.)  The company has continued to develop Lime Wire's user base by promoting the program's infringing capabilities, and marketing it to users known to commit infringement. (Id.)

66.     The Arista Court found that Lime Wire's sources of revenue depend on Lime Wire attracting the massive user population generated by its infringement-enabling features. From 2000 to 2004, Lime Wire earned revenue primarily by selling advertising space on Lime

21

Wire and by distributing software bundled with Lime Wire. As Lime Wire's user base expanded, the company's revenues from advertising and software distribution increased. In 2004, Lime Wire began selling Lime Wire "Pro," an upgraded version of Lime Wire that is available for purchase and makes file-sharing activities easier. In January 2008, Lime Wire obtained licenses to sell approximately half a million songs, and opened an online Lime Wire Store offering authorized sales of digital music. Lime Wire markets Lime Wire "Pro" and the Lime Wire Store to Lime Wire users. Lime Wire's "commercial success, therefore, is derived largely from the high-volume use of Lime Wire, most of which is infringing." (Arista Decision at pp. 37-38).

67.     Defendants have and continue to make large sums of money from their massive infringement.

68.     In the wake of the Supreme Court's decision in *Grokster*, Defendants undertook efforts to insulate ill-gotten gains from creditors. Mr. Gorton stated that he had established a family limited partnership, into which he would later place assets in an effort to avoid financial liability in the event of a judgment against him by those claiming Lime Wire infringed their copyrights.

69.     The Lime Wire FLP was created on September 1, 2005, and is controlled by Mr. Gorton, who is the general partner.


## FIRST CAUSE OF ACTION

### Inducement Of Copyright Infringement Against Lime Wire LLC, Lime Group LLC, Mark Gorton and Greg Bildson

70.     Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 69 above.

71.     Individuals using Lime Wire software and services have directly infringed and are directly infringing Plaintiffs' copyrights on a daily basis by, for example, creating unauthorized

reproductions of sound recordings embodying Plaintiffs' copyrighted compositions and distributing copies of such sound recordings to the public in violation of Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. §§ 106, et seq. The scope of infringement is massive, encompassing tens of thousands of Plaintiffs' musical compositions (including without limitation those listed in Exhibit A) and millions of separate infringing acts.

72.    Defendants are liable for inducing the copyright infringement of Lime Wire users. Defendants design, promote, and market Lime Wire as optimized for the unauthorized copying and transmission of copyrighted sound recordings, thereby actively facilitating, encouraging and enticing Lime Wire users to engage in the infringement. Indeed, Defendants intend to bring about such infringements.

73.    Defendants have induced and continue to induce infringement by, for example, aiming to satisfy a known source of demand for copyright infringement, including the market comprising users of other infringing services that were shut down or compelled to block access to Plaintiffs' copyrighted works, such as Napster, Grokster, and Kazaa.

74.    Defendants further have induced and continue to induce infringement by, for example, failing to block or diminish access to infringing material using Lime Wire, even though there are technological means to do so — means that are known to Defendants, and some of which have already been employed successfully by Defendants' competitors who operate legally.

75.    Defendants further have induced and continue to induce infringement by, for example, building and maintaining a business model to profit directly from a high volume of infringing use, including sales of the "PRO" version of Lime Wire designed specifically to facilitate high volumes of infringement, and the draw of which is the millions of infringing files placed on the network by Lime Wire Basic (and other PRO) users.

23

76.    Through the conduct described above, Defendants are liable for inducing the infringement described herein.

77.    Each violation of each Plaintiff's rights in and to each copyrighted musical composition constitutes a separate and distinct act of copyright infringement.

78.    Defendants' infringement has caused substantial damage to Plaintiffs.

79.    As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to statutory damages under 17 U.S.C. § 504(c) for each of Plaintiffs' works that have been infringed through Lime Wire.

80.    Defendants' infringement is and has been willful, intentional, purposeful, and in disregard of the rights of Plaintiffs.  The Court should therefore increase the award of statutory damages to up to $150,000 per work infringed.

81.    An exemplary list of infringed works is included in Exhibit A.  Exhibit A is non-exhaustive and undoubtedly includes only a small fraction of Plaintiffs' works that were infringed.  The identities of additional infringed works and the total number of infringed works will be determined during discovery, and the pleadings adjusted accordingly.

82.    As an alternative to statutory damages (and for infringed works that do not qualify for statutory damages, if any), Plaintiffs at their election prior to judgment are entitled to recover their actual damages and any additional profits of the Defendants attributable to the infringement. 17 U.S.C. § 504(a)-(b).

83.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

84.    Defendants' conduct has caused, and unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in

money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are

entitled to a permanent injunction prohibiting further infringement of Plaintiffs' copyrights.

## SECOND CAUSE OF ACTION

### Contributory Copyright Infringement Against Lime Wire LLC, Lime Group LLC, Mark Gorton and Greg Bildson

85.     Plaintiffs repeat, reallege and incorporate herein by reference each and every

allegation contained in paragraphs 1 through 84 above.

86.     Individuals using Lime Wire software and services have directly infringed and are

directly infringing Plaintiffs' copyrights on a daily basis by, for example, creating unauthorized

reproductions of sound recordings embodying Plaintiffs' copyrighted musical compositions and

distributing copies of such musical compositions to the public in violation of Plaintiffs'

exclusive rights under the Copyright Act, 17 U.S.C. §§ 106, 501. The scope of infringement is

massive, encompassing tens of thousands of different sound recordings (including without

limitation those listed in Exhibit A) and millions of separate infringing acts.

87.     Defendants are liable as contributory infringers for the copyright infringement

committed via Lime Wire software and services. Defendants have knowledge of the massive

infringement that has occurred and continues to occur through Lime Wire, and Defendants have

caused, enabled, facilitated, and materially contributed to that infringement.

88.     Defendants' knowledge of infringement is both actual and constructive.

Defendants have acknowledged in written and oral statements that the overarching and primary

use and purpose of Lime Wire is to infringe copyrighted music. User testimonials posted on

Lime Wire's web site and in advertising confirm this fact as well, as do express promotional

comparisons to other notorious and illegally operated P2P file sharing systems. Defendants'

knowledge is further evidenced by features of Lime Wire optimized for finding and distributing

1024495

popular music and for interfering with enforcement efforts, as well as Defendants' failure to act upon written notice of infringement.

89.     Defendants have caused, enabled, facilitated, and materially contributed to the infringement complained of herein. Defendants have, in addition to the actions above, provided the tools, support, and instruction for the infringement via Lime Wire; directly and indirectly promoted the infringement via Lime Wire and intentionally built a business model to profit directly from it; and refused to exercise their ability to stop the infringement on Lime Wire.

90.     Through the conduct described above, Defendants are contributorily liable for the infringement described herein.

91.     Each violation of each Plaintiff's rights in and to each copyrighted composition constitutes a separate and distinct act of copyright infringement.

92.     Each violation of each Plaintiff's rights in and to each copyrighted musical composition constitutes a separate and distinct act of copyright infringement.

93.     Defendants' infringement has caused substantial damage to Plaintiffs.

94.     As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to statutory damages under 17 U.S.C. § 504(c) for each of Plaintiffs' works that have been infringed through Lime Wire.

95.     Defendants' infringement is and has been willful, intentional, purposeful, and in disregard of the rights of Plaintiffs.  The Court should therefore increase the award of statutory damages to up to $150,000 per work infringed.

96.     An exemplary list of infringed works is included in Exhibit A. Exhibit A is non-exhaustive and undoubtedly includes only a small fraction of Plaintiffs' works that were infringed. The identities of additional infringed works and the total number of infringed works will be determined during discovery, and the pleadings adjusted accordingly.

26

97.     As an alternative to statutory damages (and for infringed works that do not qualify for statutory damages, if any), Plaintiffs at their election prior to judgment are entitled to recover their actual damages and any additional profits of the Defendants attributable to the infringement. 17 U.S.C. § 504(a)-(b).

98.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

99.     Defendants' conduct has caused, and unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting further infringement of Plaintiffs' copyrights.

## THIRD CAUSE OF ACTION

### Vicarious Copyright Infringement Against Lime Wire LLC. Lime Group LLC, Mark Gorton and Greg Bildson

100.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 99 above.

101.    Individuals using Lime Wire software and services have directly infringed and are directly infringing Plaintiffs' copyrights on a daily basis by, for example, creating unauthorized reproductions of sound recordings embodying Plaintiffs' copyrighted musical compositions and distributing copies of such compositions to the public in violation of Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. §§ 106, 501.  The scope of infringement is massive, encompassing tens of thousands of Plaintiffs' compositions (including without limitation those listed in Exhibit A) and millions of separate infringing acts.

102.    Defendants are liable as vicarious infringers for the copyright infringement committed via Lime Wire software and services.  At all times relevant to this action, Defendants (i) have had the right and ability to control and/or supervise the infringing conduct of Lime

27

Wire users, and (ii) have had a direct financial interest in, and derived substantial financial benefit from, the infringements of Plaintiffs' copyrighted musical compositions via Lime Wire.

103.   Defendants exhibit their ability to control activity on Lime Wire, among other ways, by building filtering mechanisms into client software that, for example, block spam and the like; preventing Lime Wire PRO subscribers from updating their software following the expiration of their subscription; causing or encouraging Lime Wire users to upgrade to new versions of Lime Wire software when Defendants desire; and their influence on and control of certain technical aspects of the Lime Wire network. Defendants' ability to supervise and control the infringing activities of Lime Wire users on Defendants' system is further evidenced by the facts alleged in paragraphs 45-53 above.

104.   Defendants have derived direct and substantial benefit from infringement, including from sales of its Lime Wire PRO software, the value of which is based essentially on the draw of obtaining unlimited, fast, and free access to Plaintiffs' popular copyrighted music. In fact, Defendants offered the Basic version of Lime Wire for free, thereby seeding their network with free copies of Plaintiffs' works to attract paying users.  The financial benefit derived by Defendants is further evidenced by the facts alleged in paragraphs 54-60 above.

105.   Through the conduct described above, Defendants are vicariously liable for the infringement described herein.

106.   Each violation of each Plaintiffs rights in and to each copyrighted musical composition constitutes a separate and distinct act of copyright infringement.

107.   Defendants' infringement has caused substantial damage to Plaintiffs.

108.   As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to statutory damages under 17 U.S.C. § 504(c) for each of Plaintiffs' works that have been infringed through Lime Wire.

1024495

109.   Defendants' infringement is and has been willful, intentional, purposeful, and in disregard of the rights of Plaintiffs.  The Court should therefore increase the award of statutory damages to up to $150,000 per work infringed.

110.   An exemplary list of infringed works is included in Exhibit A. Exhibit A is non-exhaustive and undoubtedly includes only a small fraction of Plaintiffs' works that were infringed. The identities of additional infringed works and the total number of infringed works will be determined during discovery, and the pleadings adjusted accordingly.

111.   As an alternative to statutory damages (and for infringed works that do not qualify for statutory damages, if any), Plaintiffs at their election prior to judgment are entitled to recover their actual damages and any additional profits of the Defendants attributable to the infringement. 17 U.S.C. § 504(a)-(b).

112.   Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

113.   Defendants' conduct has caused, and unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting further infringement of Plaintiffs' copyrights.

## FOURTH CAUSE OF ACTION

### Conveyance Made With Intent to
### Defraud Against Mark Gorton

114.   Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 113 above.

115.   Specifically, Mr. Gorton created a family limited partnership, into which he placed his personal assets, so that creditors could not obtain assets placed in that partnership.

29

116.   Plaintiffs became creditors of Defendants when Defendants committed torts against Plaintiffs.

117.   Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to New York Debtor and Creditor Law § 276-a.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment Against M.J.G. Lime Wire Family Limited Partnership

118.   Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

119.   Defendant Lime Wire FLP was unjustly enriched at Plaintiffs' expense under circumstances such that equity and good conscience require the Lime Wire FLP to make restitution to Plaintiffs.  In order to prevent creditors from obtaining his assets, Mr. Gorton created a family limited partnership into which he placed his personal assets.

120.   Plaintiffs became creditors of Defendants when Defendants committed torts against Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

(a)   for injunctive relief requiring that Defendants and Defendants' agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, cease infringing, whether directly or indirectly, and cease causing, enabling, facilitating, encouraging, promoting, inducing, contributing to, and participating in the infringement of, any of Plaintiffs' respective copyrights or exclusive rights protected by the Copyright Act whether now in existence or hereafter created;

(b)   as to the First, Second and Third Causes of Action, for maximum statutory damages pursuant to 17 U.S.C. §504(c), specifically, $150,000 per work with respect to each and

1024495

every timely registered composition owned by Plaintiffs that was willfully infringed and $30,000

per work with respect to each and every other timely registered composition owned by Plaintiffs

that was infringed, if any;

       (c)     as to the First, Second and Third Causes of Action, as an alternative to

statutory damages at Plaintiffs' election prior to final judgment, for an accounting of Defendants'

profits attributable to the infringement to be provided by Defendants pursuant to 17 U.S.C. §

504(b), and for payment of such profits and Plaintiffs' actual damages suffered from

infringement;

       (d)     as to the Fourth and Fifth Causes of Action, restitution and construction

trust;

       (e)     for prejudgment and post-judgment interest;

       (f)     for Plaintiffs' costs and disbursements in this action, including reasonable

attorneys' fees; and

       (g)     such further and other relief as may be just and proper.


Dated: New York, New York
      June 16, 2010

PRYOR CASHMAN LLP

By: _____
     Donald S. Zakarin, Esq. (DZ 6355)
     (dzakarin@pryorcashman.com)
     Lisa M. Buckley, Esq. (LB 5541)
     (lbuckley@pryorcashman.com)
     Frank P. Scibilia, Esq. (FS 3984)
     (fscibilia@pryorcashman.com)
     7 Times Square
     New York, New York 10036
     (212) 421-4100
     *Attorneys for Plaintiffs*

1024495

EXHIBIT A.

**Exhibit A**

**Representative List of Works Infringed**

| Composition | Songwriter(s) | Representative Recording Artist | Publisher Plaintiff |
|---|---|---|---|
| A Boy Named Sue | Shel Silverstein | Various | Evil Eye Music, Inc. |
| A Bushel and A Peck | Frank Loesser | Perry Como | Frank Music Corp. |
| A Whiter Shade of Pale | Keith Reid, Gary Brooker | Procol Harum | Essex Music, Inc. |
| All or Nothing | Wayne Hector, Steve Mac | O-Town | Peer Music III Ltd. |
| Always on My Mind | Mark James, Wayne Thompson, Johnny Christopher | Pet Shop Boys | Screen Gems-EMI Music Inc. |
| Amar A Muerte | Luis Angel Marquez | Luis Angel | Peer International Corp. |
| Anyway, Anyhow, Anywhere | Pete Townshend, Roger Daltry | The Who | Devon Music, Inc. |
| As the World Turns | Jeff Bass, Mark Bass, Marshall Mathers | Eminem | Sony/ATV Melody |
| Astronomy Domine | Syd Barrett | Pink Floyd | Essex Music, Inc. |
| Baby, It's Cold Outside | Frank Loesser | Lady Antebellum | Frank Music Corp. |
| Back At One | Brian McKnight | Brian McKnight | Universal-Polygram International Publishing, Inc. |
| Beat It | Michael Jackson | Michael Jackson | Warner-Tamerlane Publishing Corp. |
| Billy Jean | Michael Jackson | Michael Jackson | Warner-Tamerlane Publishing Corp. |

| | | | |
|---|---|---|---|
| Boombastic | Robert Livingston, Orville Burrell, King Floyd | Shaggy | Peer Music III Ltd. |
| Brand New Man | Don Cook, Ronnie Dunn, Kix Brooks | Brooks & Dunn | Sony/ATV Tree Publishing, Sony/ATV Cross Keys Publishing |
| Breathe Again | Babyface | Toni Braxton | Sony/ATV Songs LLC |
| Carrying Your Love With Me | Steve Bogard, Jeff Stevens | George Strait | Warner-Tamerlane Publishing Corp. |
| Catch Me When I Fall | Kara DioGuardi | Ashlee Simpson | Bug Music |
| Changes | Frank Iommi, John Osbourne, William Ward, Terence Butler | Black Sabbath | Essex Music International, Inc. |
| Clown | Jonathan Davis, James Schaffer, David Silveria, Reginald Arvizu, Brian Welch | Korn | WB Music Corp. |
| Cold Cold Heart | Hank Williams, Sr. | Norah Jones | Sony/ATV Acuff Rose Music |
| Come Clean | Kara DioGuardi | Hilary Duff | Bug Music |
| Crapshooter's Dance | Frank Loesser | Guys and Dolls Cast | Frank Music Corp. |
| Dead | Jonathan Davis, James Schaffer, David Silveria, Reginald Arvizu, Brian Welch | Korn | Universal Music-Z Tunes LLC |
| Dead Skunk | Loudon Wainwright III | Loudon Wainwright III | Frank Music Corp. |
| Don't Tell Me It's Love | Kara DioGuardi | Marc Anthony | Bug Music |
| Echoes | Roger Waters, Rick Wright, Nicholas Mason, David Gilmour | Pink Floyd | Hampshire House Publishing Corp. |
| Everything You Want | Matthew Scannell | Vertical Horizon | WB Music Corp. |

| | | | |
|---|---|---|---|
| Feels Like Sunday | Kara DioGuardi | Jesse McCartney | Bug Music |
| Foggy Mountain Breakdown | Earl Scruggs | Lester Flatt and Earl Scruggs | Peer International Corp. |
| Forgotten | Mike Shinoda, Mark Wakefield, Brad Delson, Chester Bennington, Joseph Hahn, Robert Bourdon, Dave Farrell | Linkin' Park | Universal Music-Z Songs, Universal Music-Z Tunes LLC |
| Fugue for Tinhorns | Frank Loesser | Frank Sinatra | Frank Music Corp. |
| Georgia On My Mind | Hoagy Carmichael, Stuart Gorrell | Michael Bolton | Peer Music III Ltd. |
| Gone Country | Bob McDill | Alan Jackson | Universal-Polygram International Publishing, Inc. |
| Hell Yeah | James Franks | Bloodhound Gang | Universal-Songs of Polygram Int., Inc. |
| Hey Ladies | Kevin Briggs, Kandi Burruss, Beyonce Knowles, Latavia Roberson | Destiny's Child | Hitco Music Publishing LLC |
| Human Nature | Steve Porcaro, John Bettis | Michael Jackson | Sony/ATV Tunes LLC |
| I Hate You Then I Love You | Elio Cesari, Manuel De Falla Matheu, Alberto Testa, Fabio Tes | Celine Dion and Luciano Pavarotti | Songs of Peer, Ltd. |
| I Need To Know | Marc Anthony, Mark Cory Rooney | Marc Anthony | Sony/ATV Tunes LLC, Sony/ATV Songs LLC |
| I Reach For You | Kara DioGuardi | Marc Anthony | Bug Music |
| I'd Rather | Anthony Crawford | Luther Vandross | Almo Music Corp. |

| It's All Coming Back To Me Now | Jim Steinman | Celine Dion | Universal-Songs of Polygram Int., Inc. |
|---|---|---|---|
| It's the Same Old Song | Brian Holland, Edward Holland, Jr., Lamont Dozier | The Four Tops | Jobete Music Co., Inc. |
| Jeepster | Marc Bolan | T Rex | Essex Music International, Inc. |
| Just Like This | William Frederick Durst, Leor Dimant, Wesley Borland, John Otto, Samuel Rivers | Limp Bizkit | Universal Music-Z Tunes LLC, Universal Music-Z Songs |
| Lamento Boliviano | Natalio Faingold, Raul Gomez | Enanitos Verdes | Songs of Peer, Ltd. |
| Let's Wait A While | James Harris III, Terry Lewis, Janet Jackson, Melanie Andrews | Janet Jackson | EMI April Music Inc./EMI Blackwood Music Inc. |
| Life of My Own | Brad Arnold, Robert Harrell, Matthew Roberts | 3 Doors Down | Songs of Universal, Inc. |
| Lonestar | Lee Alexander | Norah Jones | EMI Blackwood Music |
| Luck Be A Lady | Frank Loesser | Frank Sinatra | Frank Music Corp. |
| Motel Blues | Loudon Wainwright III | Loudon Wainwright III | Frank Music Corp. |
| Ms. Jackson | David Sheats, Andre Benjamin, Antwan Patton | Outkast | EMI April Music Inc. |
| My Generation | Peter Townshend | The Who | Devon Music, Inc. |
| My Girl | Ronald White, Smokey Robinson | The Temptations | Jobete Music Co., Inc. |
| New Kid In Town | John Souther, Glenn Frey, Donald Henley | The Eagles | EMI Blackwood Music Inc. |

| Nights In White Satin | Justin Hayward | Moody Blues | Essex Music, Inc. |
|---|---|---|---|
| No Scrubs | Kandi Burruss, Tameka Cottle, Kevin Briggs | TLC | Hitco Music Publishing LLC |
| Once In Love With Amy | Frank Loesser | Mel Torme | Frank Music Corp. |
| Say My Name | Kelendria Rowland, Latavia Roberson, LeToya Luckett | Destiny's Child | Sony/ATV Tunes LLC, Sony/ATV Melody |
| Shoots and Ladders | Jonathan Davis, James Schaffer, David Silveria, Reginald Arvizu, Brian Welch | Korn | WB Music Corp. |
| Sin Wagon | Stephony Smith, Emily Erwin, Natalie Maines | Dixie Chicks | EMI Blackwood Music Inc. |
| Smooth Criminal | Michael Jackson | Michael Jackson | Warner-Tamerlane Publishing Corp. |
| Sober | Kara DioGuardi | Pink | Bug Music |
| Space Oddity | David Bowie | David Bowie | Essex Music International, Inc. |
| Standing On The Corner | Frank Loesser | Four Lads | Frank Music Corp. |
| Strong Enough | Sheryl Crow, Bill Bottrel, David Baerwald, Kevin Gilbert, David Ricketts | Sheryl Crow | Sony/ATV Tunes LLC |
| Swear It Again | Steve Mac, Wayne Hector | Westlife | Peer Music III Ltd. |
| The Freshmen | Brian Vander Ark, Donny Brown, Doug Corella, A.J. Dunning, Brad Vander Ark | The Verve Pipe | EMI April Music Inc. |
| The Painter | Dane De Viller, Sean Hosein | O-Town | Universal Music-MGB Songs |

| The Way You Make Me Feel | Michael Jackson | Michael Jackson | Warner-Tamerlane Publishing Corp. |
| --- | --- | --- | --- |
| There You Go | Alecia Moore, Kevin Briggs, Kandi Burruss | Pink | Hitco Music Publishing LLC |
| To Love You More | David Foster, Edgar Bronfman | Celine Dion | Peermusic, Ltd. |
| Tu Solo Tu | Felipe Valdes Leal | Selena | Peer International Corporation |
| Twist | Jonathan Davis, James Schaffer, David Silveria, Reginald Arvizu, Brian Welch | Korn | WB Music Corp. |
| U Got It Bad | Usher Raymond, Jermaine Dupri, Bryan Cox | Usher | EMI April Music Inc. |
| Unchained Melody | Hy Zaret, Alex North | Elvis Presley | Frank Music Corp. |
| Walk Away | Kara DioGuardi | Kelly Clarkson | Bug Music |
| Wanted Dead or Alive | Jon Bon Jovi, Richard S. Sambora | Bon Jovi | Sony/ATV Tunes LLC |
| We Are Family | Kuro, Bernard Edwards, Nile Rodgers | Sister Sledge | Sony/ATV Songs LLC |
| You're A God | Matthew Scannell | Vertical Horizon | WB Music Corp. |